It's in Appeal No. 23-3420, Timothy Hoffstead v. Northeast Illinois Regional Commuter Railroad Corporation, or METRA. Morning. May it please the Court, Counsel, Taylor Muzzi on behalf of Plaintiff Appellant Timothy Hoffstead. This matter is before the Court following the District Court's decision granting summary judgment in favor of METRA. The District Court held that Hoffstead presented sufficient evidence to meet the first two elements of his claim under the ADA. First, that he's disabled as a result of his ADD and his migraines. And second, that he's qualified to perform the essential functions of his job as a police officer-canine handler. So, like many employment discrimination cases, we are here on the element of causation. Hoffstead presented ample evidence from which a jury could conclude that METRA took multiple adverse actions against him because of his disabilities. Hoffstead asked this Court to reverse the District Court's grant of summary judgment for METRA and remand this matter for trial. Mr. Muzzi, the parties seem to agree that the dispute started when Hoffstead failed to reply to the MRO's three requests for proof of valid prescriptions. The parties also seem to agree that when a METRA employee fails a drug and alcohol test, the policies that METRA applied to Mr. Hoffstead are the correct policies to apply. If METRA was simply unenforcing the pre-written policy against Mr. Hoffstead, doesn't that mean that Mr. Hoffstead cannot prove that METRA's actions were discriminatory? Judge, I agree with you that the initially positive drug test was the source of the dispute in this matter from which everything flowed. METRA argued to the District Court and would have this Court believe that that was an unavoidable or unalterable course of action. From the moment of that initially positive drug test, nothing else could happen except the path that METRA went down. And Hoffstead submits that that is not the case. First of all, because Mr. Hoffstead had, everything was above board. He had reported these prescription medications to METRA on METRA's required form. Both his Adderall and his Norco were on record with METRA as things that he were taking and things that he was permitted to take. Now, unfortunately, he did not receive, did not respond to the MRO's phone call to validate those prescriptions following the initially positive test. Had that happened, we probably wouldn't be here today. However, sorry, Judge, he did provide those prescription medications within five days. So five days later, he provided those prescriptions to the MRO and to METRA and had that test result reversed from a negative, from a positive to a negative. Am I wrong if I thought it took him 15 days to send the copies of the labels from his prescription bottles to the MRO and METRA? So Judge, the random test he submitted to was on July 24th, 2018. The test was deemed positive on August 3rd, 2018. And Mr. Hofstadt provided those prescriptions and the test was reversed on August 8th, 2018. So it depends where we count from, right? That's one way to look at it, yes. Yeah, okay. But, you know, this was, to be perhaps too flip about it, we're not launching the space shuttle here, right? This was not something that then took off and couldn't be diverted at some point. METRA could have, once those tests were reversed from a positive to a negative, pulled him out of the program. They put him into the rehabilitation program as if he was a substance abuse offender, which he was not. And they could have, once he provided those prescription medications, they could have pulled him out of the program and said, you clearly don't belong here. This was a mistake, right? This was a mistake that you weren't able to respond in time. We had the documentation on the record ahead of time. We understand what happened here. But they did not do that. And instead, they are hiding behind that initially positive test to justify the course of action that followed. See, I read the record a little bit differently. And you can tell me I'm mistaken here. I don't know his first name. Chief Perez, somebody Perez, thought that your client was, the jargon that you all are using, is not certified by this training board, training and standards board. And he was not recertified or relicensed or reauthorized, whatever the right words are, until September 17th. But the decision was already made as to the replacement of the handler, was it not, on September 13th. And so if the decision maker, I see his name here, is Joseph Perez, and Joseph Perez made the decision on the basis that Mr. Hofstede was not licensed or certified to be a dog handler for METRA, how can that reflect discrimination on the basis of disability? No, it may be that he's mistaken, right? But the plaintiff, there's no showing that that's like a lie or pretext or anything like that. Well, we would submit, Your Honor, that his email from September 19th, 2018, from Chief Perez, first, it falsely claims that Mr. Hofstede was decertified on September 17th and said he was reinstated on September 17th. That is incorrect. Okay, what evidence shows that Mr. Perez, or Sergeant Perez, knew that that was incorrect? There is none, but I think it needs to be paired with the rest of that email, where he questions Officer Hofstede's ability to comprehend written text, which he also says in his email, these were issues that the METRA Police Department raised with the Employee Assistance Program. Right, but is it the context of the second paragraph around METRA's trying to figure out if they can place him in some other position? In other words, the decision to not put him in the handler, canine handler role, was made on the 13th. But I thought on the 17th, or I'm sorry, by the 19th, there was still a question, can he perform another role? I think that his email on the 19th reflect his held perceptions about Mr. Hofstede and the prescriptions he was taking as it applied to the application process, because Mr. Hofstede did apply for the canine handler position on September 13th. Before that closed and his replacement was selected on September 14th. Those statements in his email show, demonstrate his animus towards Mr. Hofstede and his prescription, to the point that METRA's Police Department raised this with the Employee Assistance Program, who told the Police Department that those concerns were unfounded. And then he further indicated that he had questions or concerns about impairment from Mr. Hofstede's prescriptions. So, I see I'm running short of my time here. You want to save your rebuttal time? It's up to you. If I may just wrap up a little bit now, to note that there are, in addition to the things I've just talked about, there are issues of suspicious timing, there's issues of animus in terms of the commander who pulled Mr. Hofstede out of service. The things he said to him at the time he pulled out of service saying, you know, you had a piss test a couple of weeks ago and it was fucking dirty. I mean, these are the kinds of comments that demonstrate the animus towards Mr. Hofstede and the disabilities he had and the prescriptions that he took for those disabilities. And I will reserve the rest of my time. Thank you very much. Okay. You're quite welcome. Mr. Moore, good afternoon. We'll hear from you. May it please the Court. My name is David Moore. I represent the Appley METRA. The District Court's decision granting summary judgment in favor of METRA should be affirmed. The record establishes that it was plaintiff's own repeated inaction that caused the entire chain of events about which he complained. Mr. Moore, Mr. Hofstede talks about the fact that he self-disclosed his medications. And I know defendants' METRA's position is, well, you know, that's not an acceptable or sufficient response to a positive drug test, that they need copies of prescriptions. Is that in a handbook or a guidebook somewhere so that Mr. Hofstede and other employees would know that? Yes, Your Honor. That is, and this is undisputed, that that is contained in METRA's drug and alcohol policy. And if you look at our party's joint statement of undisputed facts, which were submitted to Judge Ellis, the parties agreed that the self-disclosure form plays no role in the medical review officer's analysis of a drug test result under the policy, and that the forms are, quote, an employee's self-report of medications and not medical evidence of a valid prescription by a doctor. And it was also undisputed that employees, regardless of an approved medication, must provide a legitimate medical explanation to the MRO in the event of a positive drug test. So that's all in the drug and alcohol policy, which Mr. Hofstede agreed that he had received. So a notion that Mr. Hofstede just thought he had clicked all the boxes because he had predisclosed, that would be inconsistent with what's in the handbook, had he read the handbook, and presumably he did.  And again, going back to the undisputed facts, it's undisputed that Plaintiff, a sworn police officer, testified positive for amphetamine, hydrocodone, and hydromorphone. It is undisputed that after plaintiff's drug tests were non-negative, the medical review officer attempted to contact Plaintiff three times. It's undisputed that the MRO did so to obtain a legitimate explanation, consistent with the policy, before reporting a positive test to METRA. And only after Plaintiff did not respond to the medical review officer's three calls did the MRO then report the drug test to METRA. And I believe I heard counsel just say, had Plaintiff responded, had that happened, we would not be here today. I do want to ask you something about that rehab program. His drug test, of course, was the only reason that he had to go through METRA's rehabilitation and education program. Now, that drug test was revised from positive to negative on August the 8th. And Hofstede did not begin the program until August 18, 10 days later. Given that his drug test result was changed long before he started the program, why did he have to complete this rehabilitation and education program at all? I mean, what's he doing there? So, there's two things going on here, Judge Rovner. First, Chief Perez honestly believed that the Plaintiff was decertified by the Illinois Law Enforcement Training Standards Board at that time, ineligible for employment. The other piece of this is that when Plaintiff was notified of his positive drug test, he was given a choice. The choice was to participate in a hearing about a week later, an investigatory hearing, pursuant to the collective bargaining agreement to challenge that drug test, or to waive his right under the collective bargaining agreement to participate in the hearing and elect to participate in the R&E program. So, this was all laid out in writing to him and explained to him. So, he had the choice. Do I want to challenge the positive drug test and go to the investigatory hearing, or do I want to take the certainty of waiving the right to the hearing and electing to participate in the R&E program? So, he had agreed, pursuant to the rules in the collective bargaining agreement, to waive his hearing and to complete all the requirements of that process, which included going to the EAP. Can you explain that again? I'm not following that. If the test was revised, as Judge Rovner, meaning you're clean, you're clear, you've submitted the objective prescription evidence that way, the positive result is now reversed, however you want to describe that. Why wouldn't someone in his position say, well, I'm not going to a drug rehab class. What would I go to a drug rehab class for? I was taking prescription medication. I don't know why he elected to pursue the path that he chose to pursue. But when you were responding to Judge Rovner, you responded with points about Chief Perez, and what I was thinking is, what does Chief Perez have to do with why the guy would go to a drug class or not? So, at the moment in time that he elects to participate in the program, he had the choice. Do I want to contest the drug test and say, no, this is wrong, I have prescriptions, or do I want to agree to the collectively bargained provisions? Maybe we're just ships passing in the night. At the time he made that decision, though, Judge Rovner just established that the test had been reversed. Let me step a minute back then. So he signed the forms on August 3rd, before the drug test had been reversed. So on August 3rd, he's notified of the drug test by Commander Wendell. Several hours go by, and he speaks to Commander Mack at night, and Commander Mack tells him that Commander Mack can't make the decision for him. Commander Mack says he has to make his own choice, and he should talk to his own union lawyer. And the hearing wasn't for another week, yet he went ahead and showed— So the choice was not made after August 8th, it was made before August 8th. Correct. My apologies for the confusion. When was he informed that his drug test results were reversed? I don't know if that is crystal clear in the record. He was informed that he was able to apply for reemployment on a collective bargaining agreement on September 17th, but I don't know if it's clear when he exactly learned that the test had been reversed. But it was revised on August 8th. Surely he—somebody must have said, you know, don't worry about it, kiddo. You're fine. I am so flummoxed by this. Ten days later, he's in this program. I mean, is your program filled with people who shouldn't be there? Again, Your Honor, he chose to go into the program. And at that time— You gave him this Hobson's Choice. Well, I don't know if it was a Hobson's Choice. He had the choice to contest his—the finding of a positive test at the hearing or the choice of pursuing the rehab program. He had a choice. He didn't have to decide that day. He did after being told to talk to a union lawyer. And he wouldn't have been reinstated because METRA immediately reported his dismissal and positive drug test to the Illinois Law Enforcement Training Standards Board. They understood, albeit incorrectly, that that meant he was not even eligible for employment. He couldn't even go back into the job until the board had recertified him. So the whole question is, was plaintiff's disability the catalyst which prompted METRA to take any of these adverse actions? Or was it the undisputed fact that he didn't respond to the MRO's three calls? If he had responded to the three calls, we wouldn't be here today. Do you know why it took—so Dr. Feldman contacts Ms. Lange on August 8th. Tells her, you know, we got copies of these prescriptions. And then it took Ms. Lange until September 7th, so almost a month later, when Ms. Lange tells Perez and Riggio that Hostos now is cleared to return to service. Why did it take that long? So in the drug and alcohol policy, you also have to complete a medical exam and another drug test. He went for the medical exam and the drug test on August 27th. That's in Undisputed Facts 83 and 84. But by then, Ms. Lange, who was in charge of this office, knew that he had prescriptions that resulted in the false test, right? Yes, that's true. But at this time, they're honoring the rules set forth in the collective bargaining agreement. And in terms of why it took until September 7th, that was because at the final medical exam on the 27th, that doctor sent questions to Hofstad's doctor that were not answered until September 7th. So as soon as they got the final clearance from the outside doctor at Concentra, that is when the medical department told the police department that he had completed the program. So everything is governed by the collective bargaining agreement with regard to these timelines and what needs to be done, and no one wanted to veer from it, it seems like. Correct. And no one from the union asked, neither the plaintiff nor the union, asked the department to make any changes to those bargain for rights and procedures. I see that my time is up. If you have any other further questions, I'd be happy to answer them. Okay, hearing none, Mr. Moore, thank you very much. Yes. Appreciate it. Thank you, Your Honors. Okay, Mr. Muzzi, you've got about a minute and a half. Thank you. I'd like to pick up on Judge Rovner's comment that Hofstad was faced with a Hobson's choice. When he was at that meeting with Commander Wendell when he was first removed from service, there really are disputed facts about what he believed his choice was. In addition to swearing in his face, as I mentioned at the end of my opening remarks, Commander Wendell also told Officer Hofstad that his union couldn't help him and that he didn't need to talk to his union. He also told him that if he enrolled in the program, he would not lose his job, which is, in fact, untrue because what happens when you go into the rehabilitation program is you technically become a dismissed employee who is then subject to reinstatement after you complete the terms of the program. Mr. Muzzi, what's the record show, if anything, in your view, of when he started the program, correct, on the 18th of August? I believe that's correct, yes. Okay. Does the record tell us when he began the program, was he aware or unaware that the test had been revised? I believe he was aware on August 8th, Your Honor, the day that he contacted the MRO. Okay. I believe the test results were— And what's the best explanation from the record about why he didn't say, what in the world am I doing at a drug program? I believe he did. He raised it with the substance abuse professional who said, you shouldn't be here, this is a paperwork problem, this is a clerical problem. And then it got to Metro and Metro said, no, he has to go through the program. Again, it was— So all of this is in the record? We'll see all of this in the record? Yes, Judge. And what's the best evidence of somebody telling him, notwithstanding the revised test, you must complete the program? Well, there is his testimony about his conversation with the substance abuse professional, Mr. Hofstad, and I believe—I don't know off the top of my head, Your Honor. Okay. Okay, very well. Thank you. Mr. Mosey, thanks to you. Again, Mr. Moore, thanks to you and your colleague. We'll take the appeal under advisement.